**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

| | |
|---|---|
| WASHINGTON GOVERNMENT ENVIRONMENTAL SERVICES COMPANY LLC, ENGINEERED PRODUCTS DIVISION, </br></br> Plaintiff, </br></br> v. </br></br> SHAW AREVA MOX SERVICES, LLC, </br></br> Defendant. | **Civil Action No.:** 3:14-cv-02125-JFA </br></br> **JURY TRIAL DEMANDED** |

Plaintiff Washington Government Environmental Services Company LLC, Engineered Products Division ("WGES") states the following for its Complaint against Defendant Shaw AREVA MOX Services, LLC ("MOX"):

**NATURE OF THE ACTION**

1. This action relates to MOX's responsibility for cost overruns on a contract for the fabrication of large stainless steel gloveboxes for use at the U.S. Department of Energy's Mixed Oxide Fuel Fabrication Facility at the Savannah River Site in South Carolina, for which MOX is the prime contractor.

2. MOX subcontracted the fabrication and assembly of several gloveboxes to WGES. According to the subcontract between WGES and MOX, the gloveboxes were to be built according to MOX's detailed design drawings and specifications without significant changes or additional engineering effort. WGES's work was a "build-to-print" project.

3. MOX's design documents contained numerous errors, omissions, and inconsistencies. MOX issued hundreds of corrections and changes to the design during WGES's performance. The design errors and changes resulted in WGES being unable to perform on a build to print basis, and increased WGES's costs of performance by more than $14 million.

4. MOX has recognized WGES's entitlement to recover the additional costs arising from MOX's design errors and changes. Nevertheless, MOX terminated WGES's subcontract and has refused WGES's demand for payment.

5. Upon information and belief, other subcontractors engaged to fabricate stainless steel gloveboxes for the Mixed Oxide Fuel Fabrication Facility encountered many of the same errors and omissions and changes to MOX's glovebox design drawings and specifications. Upon information and belief, other subcontractors engaged by MOX encountered additional costs and delays as a result of MOX's errors and omissions and have submitted requests for equitable adjustment to address these impacts. There is currently at least one other pending action involving a subcontractor claim for additional compensation alleged to be due as a result of MOX's errors and omissions and design changes. *See Oak Ridge Tool-Engineering, Inc. v. Shaw AREVA MOX Services, LLC*, No. 3:13-cv-00992-JFA (D.S.C. filed Apr. 12, 2013).

## PARTIES

6. Plaintiff Washington Government Environmental Services Company LLC is a privately held limited liability company. The sole member of WGES is URS Energy & Construction, Inc., which is an Ohio Corporation with its principal place of business in Denver, Colorado.

7. Upon information and belief, Defendant Shaw AREVA MOX Services, LLC ("MOX") is a privately held limited liability company. Upon information and belief, the members of MOX are Shaw Environmental and Infrastructure, Inc.; AREVA NP, Inc.; Shaw Project Services Group, LLC; and AREVA Federal Services, LLC. Upon information and belief, the sole member of Shaw Project Services Group, LLC is Shaw Environmental and Infrastructure, Inc. and the sole member of AREVA Federal Services, LLC, is AREVA NC, Inc.

Upon information and belief, all of the members of MOX are citizens of states other than Ohio and Colorado.

## JURISDICTION AND VENUE

8. Subject matter jurisdiction is proper under 28 USC § 1332(a) because the action is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

9. Venue is proper because the subcontract between WGES and MOX from which this action arises provides for venue in the United States District Court for the District of South Carolina, Columbia Division.

## FACTS

10. MOX holds prime contract DE-AC02-99CH10888 with the United States Department of Energy ("DOE") for the Mixed Oxide Fuel Fabrication Facility at the Savannah River site in South Carolina. The purpose of the Mixed Oxide Fuel Fabrication Facility is to transform weapons grade plutonium into fuel-grade nuclear material. These materials are radioactive and all of the fuel fabrication takes place inside large stainless steel "gloveboxes." The Mixed Oxide Fuel Fabrication Facility will contain numerous gloveboxes as permanent fixtures.

11. MOX used a competitive process to select steel fabricator contractors qualified to manufacture the gloveboxes. MOX issued a Basic Ordering Agreement ("BOA") to the companies that it deemed to be qualified. MOX later conducted competitions among the pre-qualified manufacturers to award a Task Order Release ("TOR") for one or more specific gloveboxes.

12. On April 20, 2009, MOX awarded Basic Ordering Agreement No. 10888-B-2773 to WGES. This BOA permitted WGES to compete for TORs.

13. On September 25, 2009, after receiving WGES's proposal in response to Requests for Task Proposals 10888-R-01086, MOX issued Task Order No. 001 ("TOR 001") to WGES. The scope of TOR 001 included fabrication and delivery of three stainless steel glovebox assemblies: (a) the Primary Dosing Unit Glovebox & Ventilation ("NDP"); (b) the Final Dosing Unit Glovebox and Ventilation ("NDS"); and (c) the Powder Auxiliary Unit Glovebox & Ventilation ("NXR").

14. On March 4, 2010, MOX issued Task Order No. 003 ("TOR 003") to WGES in response to MOX's Request for Task Proposals 10888-R-012555. TOR 003 required fabrication and delivery of the Scrap Processing Unit Glovebox ("NCR").

15. On October 22, 2010, MOX awarded Task Order No. 005 ("TOR 005") to WGES. TOR 005 required fabrication and delivery of three gloveboxes: (a) PQE Glovebox 1000 and Ventilation; (b) PQE LTP Glovebox and Ventilation; and (c) PQE Glovebox 2000 and Ventilation. TOR 005 included a substantial number of mechanical subassemblies, including conveyors, elevators, lifts, trays, scales, and pellet pushers, the production of which was subcontracted to Lindquist Machine Corporation, a vendor recommended by MOX.

16. Collectively, the BOA and TOR 001, TOR 003, and TOR 005, together with the documents incorporated by reference therein, constitute "the Subcontract."

17. The Subcontract describes each of the TORS as a "build-to-print" project. A build-to-print project is "a manufacturing and production contract premised upon the drawings and specifications furnished to the contractor with contractor liability for performance effectively

circumscribed by the drawings and specifications." In re Northrop Grumman Corp., ASBCA No. 53699, et al., 04-2 BCA ¶ 32804.

18. Section E, Paragraph 1.25(k) of the BOA Terms and Conditions states that the work is a build-to-print project.

19. Section 1.5 of specification DCS01 ZMJ DS SPE M 19113 states that "[d]etailed drawings show individual pieces of components. These provide complete dimensions of the part and necessary manufacturing details. Detailed drawings may also provide installation details and interface details."

20. Section B of the requests for proposal issued for TOR 001, TOR 003, and TOR 005 stated that each of the TORs would be fixed-price incentive fee ("FPIF") subcontracts, under which MOX would share in cost savings and cost overruns arising during the subcontractor's performance, up to a specified ceiling price.

21. Before WGES submitted its proposal for TOR 001, MOX sent WGES a document explaining why MOX was using the FPIF contract type. This document states that a FPIF subcontract should be used "when there is a reasonable expectation of success within stated, measurable limits." It states further that a FPIF subcontract "should include relatively firm design, specification and performance requirements which will permit the subcontractor to operate without detailed control or technical direction. Performance goals and schedule objectives should not be impacted adversely by events or direction outside of the control of the sub-subcontractor."

22. The Subcontract incorporates MOX's responses to offeror questions. MOX's response to Question #18 states that MOX would be responsible for delays and cost changes arising from incomplete or problematic dimensions on MOX's drawings. The offeror's question

asked whether MOX would quickly respond to requests related to incomplete or problematic dimensioning. The response states that "MOX endeavers [sic] to answer all requests for information in a timely manner. However, if delays and/or cost changes occur due to the length of time that MOX takes to respond, requests for schedule and cost change are accommodated providing the request is backed up by credible data."

23.     In a letter dated September 24, 2009, MOX summarized discussions held with WGES in the TOR 001 pre-award conference on September 9, 2009. The first bullet on the second page of that letter states "MOX Services wanted to know if URS realized this was a build-to-print job. MOX Services provides detail drawings showing the final product to be delivered."

24.     Through the Subcontract and communications to WGES, MOX represented that its design for the gloveboxes and related assemblies was complete and ready to be constructed on a "build-to-print" basis," that there would be few changes, and that WGES's obligation was simply to build what had been designed.

25.     Despite these representations, the gloveboxes and assemblies specified in TOR 001, TOR 003, and TOR 005 could not be completed on a "build-to-print" basis. Rather than the highly detailed and accurate drawings and specifications that would have allowed WGES to weld and fabricate the gloveboxes without significant engineering effort, MOX's drawings and specifications contained numerous errors, omissions, and inconsistencies. Errors encountered in the MOX drawings and specifications include: (a) incorrect tolerances; (b) omitted tolerances; (c) missing weld symbols; (d) incomplete weld symbols; (e) conflicting weld types: (f) weld configurations that prevented performance of required inspections; (g) missing material callouts; (h) discrepancies in mechanical properties; (i) missing parts on drawings; (j) inadequate details

on interior pipe routing; (k) missing dimensions on piping; (l) missing dimensions for penetrations; (m) incorrect dimensioning; (n) incorrect interface dimensioning; (o) incorrect geometric dimensioning and tolerances (GD&T); and (p) incorrect illustrations.

26.     MOX issued more than 800 Engineering Change Requests ("ECRs") in an attempt to correct the defects and ambiguities in its glovebox drawings and specifications. Each ECR increased the level of effort required of WGES. Although each ECR "corrected" one or more errors or omissions in the glovebox designs and specifications, MOX refused to issue revised and conformed drawings and specifications incorporating the ECRs. In an attempt to implement the ECRs, WGES was required to perform substantial additional engineering activities that would not have been required on a build-to-print project. WGES engineers were required, for example, to develop models of the gloveboxes to evaluate constructability issues and to create detailed drawings and sketches to instruct the fabrication shop how to construct the various assemblies. WGES engineers expended extensive time creating these models, drawings, and sketches, and in "interpreting" the MOX design documents for WGES machining and fabrication personnel.

27.     WGES also incurred additional costs preparing Supplier Requests ("SRs"), which are formal questions presented to MOX in an effort to overcome the errors and omissions in the MOX drawings and specifications. Although MOX was contractually required to promptly respond to these requests, MOX's responses to WGES's SRs were often late or incomplete.

28.     MOX's errors, omissions, and changes also disrupted WGES's shop fabrication process. Normally, on a build-to-print fabrication project, WGES engineers would create a set of documents called "travelers" that would direct the fabrication process. On this project, however, WGES's machinists and welders were not able to work efficiently from a single set of travelers.

29. In some cases, parts remained mounted on idle equipment for days or weeks as WGES waited for MOX to clarify or fix the defective design drawings and specifications. In other cases, glovebox parts had to be mounted and removed multiple times from WGES fabrication machinery so that other parts could be fabricated while the affected parts were "on hold."

30. Minor changes after parts were otherwise completed required WGES to mount and dismount parts multiple times. Not only was this inefficient, it also disrupted other ongoing fabrication work. These disruptions and inefficiencies resulted in a significant increase in machining and fabrication labor and associated costs.

31. WGES's engineering, machining, and fabrication activities were also significantly disrupted by Discrepancy Reports ("DRs") that were the result of MOX's deficient design. The DR process is normally used to address errors for which the manufacturer is responsible, but MOX required the use of the DR process for errors that were the result of MOX's defective design and ECRs. These DRs, as well as MOX's late and incomplete responses to DRs, caused considerable disruption and inefficiencies to the engineering, machining, and fabrication work.

32. In addition to the errors and omissions in the original design drawings and specifications and efforts to address them through ECRs, SRs, and DRs, MOX issued nearly 400 directed changes ("RFCPs") affecting WGES's work. Some of the RFCPs were negotiated and incorporated into subcontract modifications increasing WGES's compensation and extending the performance schedule. In total, there were seven formal subcontract modifications issued for TOR 001, three for TOR 003, and five for TOR 005.

33. At MOX's direction, however, the modifications included only a portion of the estimated direct costs incurred to perform the changed work. The subcontract modifications did not reflect either WGES's actual costs or the schedule impact of MOX's design deficiencies and changes.

34. MOX nevertheless recognized that its design deficiencies and changes increased WGES's costs and delayed WGES's performance. MOX directed WGES to submit a request for equitable adjustment ("REA") to address the actual cost and schedule impact of MOX's design errors and changes.

35. In accordance with MOX's instructions, WGES prepared and submitted an initial draft REA on March 7, 2011. Because WGES's work was only partially complete at that time, the March 7, 2011 REA reflected only a portion of WGES's increased costs. WGES submitted an updated REA on September 20, 2011.

36. Although WGES incurred millions of dollars in increased costs and encountered significant delays to its performance, WGES's REAs remain unresolved.

37. Despite MOX's failure to pay WGES's additional costs, WGES continued work through the summer of 2012. On August 20, 2012, when WGES's work was approximately 75 percent complete, MOX directed WGES to stop work on TOR 001, TOR 003, and TOR 005 and announced its unilateral decision to "de-scope" WGES's remaining work.

38. MOX's August 20, 2012 direction was in fact a termination for convenience of WGES's subcontract. Under the applicable termination clause, WGES is entitled to compensation of $17,448,452, which includes the additional compensation due as a result of MOX's design errors and directed changes.

39. In accordance with applicable requirements, WGES submitted a termination settlement proposal to MOX on May 7, 2013. The termination settlement proposal included a revised REA seeking payment of $14,392,471, a sum that reflects the additional costs incurred by WGES as a result of MOX's design errors and changes, plus reasonable overhead and profit. The termination settlement proposal demands payment of $17,448,452.

40. More than a year has passed since the submission of WGES's termination settlement proposal. MOX has failed to pay the amount of the claim that a reasonable investigation would have determined was due.

## COUNT I—BREACH OF CONTRACT

41. Each of the foregoing paragraphs 1 through 40 is hereby incorporated by reference.

42. All conditions precedent to WGES's right to payment of $17,448,452 for its work under TOR 001, TOR 003, and TOR 005 have been satisfied or waived.

43. MOX's failure to pay WGES the amount due is a material breach of contract.

44. As a direct and proximate result of MOX's breach, WGES has suffered damages in an amount to be proven at trial not less than $17,448,452.

45. WGES made a due and just demand for payment for $17,448,452 on or about May 7, 2013.

46. MOX has unreasonably refused to pay some or all of the amount due and owing.

47. Pursuant to S.C. Code § 27-1-15, MOX is entitled to recover the full amount of its demand as well as all costs, attorneys' fees, and all lawful interest incurred in enforcing MOX's right to payment.

**WHEREFORE**, WGES demands judgment in its favor and against MOX in an amount not less than $17,448,452, plus pre-judgment interest, post-judgment interest, costs, attorneys' fees, and such other and further relief that the Court deems just and proper.

## JURY DEMAND

Plaintiff WGES requests trial by jury for its breach of contract claim.

Respectfully submitted this 2nd day of June 2014.

By: /s/Erik T. Norton, Fed. Bar. No. 09683
Nelson Mullins Riley & Scarborough LLP
Meridian, 17th Floor
1320 Main Street
Columbia, SC 29201
Phone: (803) 255-9552
Fax:    (803) 256-7500
erik.norton@nelsonmullins.com

Michael A. Gatje (*pro hac application to be submitted*)
Brian P. Waagner (*pro hac application to be submitted*)
Husch Blackwell LLP
750 17th Street, N.W., Suite 900
Washington, D.C. 20006
Phone: (202) 378-2300
Fax:    (202) 378-2318
michael.gate@huschblackwell.com
brian.waagner@huschblackwell.com

**Attorneys for Washington Government Environmental Services Company LLC, Engineered Products Division**